J-S23043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.H., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 386 EDA 2025 |

Appeal from the Order Entered March 3, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000714-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 387 EDA 2025 |

Appeal from the Decree Entered January 24, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000416-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 388 EDA 2025 |

Appeal from the Order Entered March 3, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000601-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G.B., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.H.-F., MOTHER | | |
| | | No. 389 EDA 2025 |

Appeal from the Decree Entered January 24, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000281-2023

BEFORE: STABILE, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED AUGUST 29, 2025**

T.H.-F. ("Mother") appeals from the decrees involuntarily terminating her parental rights to M.H., III, a/k/a M.H. (born in December of 2014) ("M.H."), and daughter, A.H. a/k/a B.G.B. (born in June of 2021) ("A.H.") (collectively, "the Children"),[1] and from the orders changing the permanency placement goals from reunification to adoption. Because the record supports the trial court's finding that Mother's unremedied and repeated and continued incapacity, abuse, neglect or refusal has caused the Children to be without essential parental care, and, further, the evidence of record demonstrates that involuntary termination of Mother's parental rights is in the Children's best

_____

[1] The trial court also involuntarily terminated the parental rights of the Children's father, M.H., Jr. ("Father"). In addition, with respect to A.H., the court terminated the parental rights of any unknown father. Neither Father nor any unknown father have filed appeals from the decrees or goal change orders.

- 2 -

interests, we affirm the decrees and dismiss the appeals from the permanency review orders as moot.

The factual and procedural history of this case is as follows. Mother has a long history of addiction to phencyclidine ("PCP") and behavior that has been described as "bizarre and erratic." N.T., 11/14/24, at 75-76; *see also* Trial Ct. Op., 4/22/25, at 4.

M.H.'s dependency arose from a report received by the Philadelphia Department of Human Services ("DHS") in September 2019, alleging that Mother brought M.H. to Temple University Hospital for a head injury. *See* N.T., 11/14/24, at 11. There is no indication in the record regarding the severity of the child's injury; however, the report alleged that Mother was observed by hospital staff to be "under the influence." *Id*. Upon investigation, the report was indicated, and the court placed M.H. in the protective custody of DHS on October 23, 2019. *See* Trial Ct. Op., 4/22/25, at 5 (internal citation omitted). Following a hearing, the court adjudicated M.H. dependent on November 26, 2019, and it made reunification his placement goal. *See id*. at 5-6.

DHS assigned Mother single case plan objectives. The objectives included, *inter alia*, obtaining a mental health assessment and complying with any recommended treatment; complying with medication management; obtaining any recommended drug and alcohol treatment; attending random drug screens at the Clinical Evaluation Unit ("CEU"); and participating in

supervised visitation.   *See* Trial Ct. Op., 4/22/25, at 5; *see also* N.T., 11/14/24, at 15.  The court eventually modified Mother's supervised visitation with M.H. ordering the visitation to occur at M.H.'s discretion, due to his insistence on not seeing Mother.  *See* N.T., 11/14/24, at 22, 24-25.  Mother was also required to maintain stable housing.  *See id*. at 15.

M.H. remained in foster care at the time of A.H.'s birth in June 2021. A.H. was born with PCP in her system.  *See id*. at 6.  She was placed in DHS's protective custody upon her discharge from the hospital.  *See id*. at 9.  The court adjudicated A.H. dependent in July 2021, and it likewise made reunification her permanency placement goal.

In October 2024, DHS filed petitions to change the Children's permanency placement goals from reunification to adoption and for the involuntary termination of Mother's and Father's parental rights to the Children.

By the time of these filings, Mother, who had not participated in mental health and drug and alcohol treatment for years, had resumed attending mental health and drug and alcohol treatment for approximately six months. *See* N.T., 11/14/24, at 18, 21.  Additionally, Mother had not participated in any random drug screens at the CEU in 2024, despite the court consistently ordering the screens.  *See id*. at 20, 43-44.  Prior to 2024, the CEU had rejected two of Mother's urine screens, one for being "cold" and the other "diluted."  *Id*. at 20.  Other than these two drug screens, the record suggests

that Mother did not attend any other random screens at the CEU throughout the Children's dependency cases. *See id*. at 53-54.

Mother's last two supervised visits with M.H. occurred in June and September 2024. *See id*. at 22, 24. Mother attended less than fifty percent of the weekly visits offered with A.H. *See id*. at 53.

The trial court held hearings on the goal change and involuntary termination petitions in November 2024, December 2024, and January 2025. The Children's best interests were represented by counsel, and their legal interests were represented throughout the proceedings by separate counsel. *See* N.T., 11/14/24, at 4 (noting the presence of each attorney for the hearing).[2]

The hearings in this matter spanned multiple days in part due to Mother's request for a continuance on the second day to obtain treatment plans and progress reports.[3] Across the multiple hearings, the trial court heard testimony from CUA caseworker Silvine Belzince ("Ms. Belzince") and Mother.

Ms. Belzince testified to the facts summarized above, and Mother also presented testimony by Ms. Belzince, who confirmed that Mother signed releases for the CUA to obtain documentation from the Wedge, and that she

---

[2] *See* 23 Pa.C.S.A. 2313(a); *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020).

[3] *See* N.T., 12/4/24, at 6.

received the documents. **See** N.T., 1/24/25, at 14.[4] Mother concluded her case by testifying on her own behalf that, *inter alia*, she began drug and alcohol treatment with the Wedge in March or April 2024, and that she attended three times per week. **See id**. at 23, 33.[5]

The court issued orders changing the Children's permanency placement goals from reunification to adoption and decrees involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1),(2), (5), (8), and (b).

On February 13, 2025, Mother filed notices of appeal from the goal change orders and the termination decrees, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b),

_____

[4]Mother, however, did not present any witness to authenticate the documents. As such, counsel for DHS and the Children objected on the basis of inadmissible hearsay to the inquiries posed by Mother's counsel regarding the content of the documentation from the Wedge. **See** N.T., 1/24/25, at 14-19. The trial court sustained the objections, but allowed Ms. Belzince to testify that the documents revealed Mother attends treatment at the Wedge three days per week. **See id**. at 14, 19.

[5] The Children's legal counsel indicated at the conclusion of the hearings that the Children desired adoption. He indicated M.H. affirmatively communicated this to him, and that A.H. is "very young" and has "care and love" for her caregiver and "[d]oes not identify biological mom at all during any of these conversations," but rather identifies the caregiver as "her mom." N.T., 1/24/25, at 48.

and the trial court likewise complied with Pa.R.A.P. 1925.[6] This Court

consolidated Mother's appeals *sua sponte*.

On appeal, Mother presents the following issues for review:

1. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(8)?

5. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(b)?

6. Whether the trial court erred by determining it to be in the [C]hildren's best interest to change the goal from reunification to adoption?

_____

[6] With respect to the permanency orders on appeal, on January 24, 2025, the court ruled out "reunification as a feasible option" and found "that adoption is in the best interest" of the Children. Orders, 1/24/25. A plain reading of these orders indicates that the court intended to change the Children's respective placement goals from reunification to adoption, which constituted a final order for the purposes of appealability. *See Interest of K.C.*, 310 A.3d 296, 299 n.2 (Pa. Super. 2023) ("Generally, orders changing a placement goal are considered final"). After Mother filed these appeals, the court amended the orders on March 3, 2025, to include language that further clarified that the trial court intended to change Children's respective permanency placement goals from reunification to adoption. *See* Amended Orders, 3/3/25. Based on the foregoing, we conclude that Mother's appeals filed with respect to the court's initial orders were appropriately and timely filed. *See* Pa.R.A.P. 341(a) (an appeal may be taken as of right from any final order entered by the trial court); *see also* Pa.R.A.P. 903.

Mother's Brief at 5-6 (unnecessary capitalization omitted).[7]

Our standard of review for appeals from decrees involuntarily terminating parental rights requires that we

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). *Accord In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

_____

[7] The Children's GAL and the legal counsel filed a joint brief advocating for this Court to affirm the involuntary termination decrees and goal change orders.

This Court need only agree with any one subsection of section 2511(a), along with section 2511(b), to affirm the termination of parental rights. ***See In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*). In this case, we focus our review on section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \* \*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> \* \* \* \*

> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Pursuant to section 2511(a)(2), the petitioning party must prove by clear and convincing evidence the following three elements to warrant termination: "(1) repeated and continued incapacity, abuse, neglect or

refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (internal citation omitted).

The grounds for termination of parental rights under section 2511(a)(2) "due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of M.A.B*., 166 A.3d 434, 444 (Pa. Super. 2017) (internal citation omitted). Finally, this Court has reiterated that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

On appeal, Mother argues that the trial court abused its discretion in terminating her parental rights pursuant to section 2511(a)(2) because she "has taken steps to remedy her condition by attending drug and alcohol treatment and obtaining housing and employment." Mother's Brief at 19. Mother further asserts that she "is willing to visit with" the Children and that she "has made visits with A.H." *Id*. Thus, Mother argues that her "incapacity can be remedied." *Id*.

The trial court concluded Mother has failed to remedy the conditions that rendered the Children without essential parental care. *See* Trial Ct. Op.,

4/22/25, at 26. Specifically, the trial court noted that Mother, despite having notice of her objectives, failed to complete them. *See id*. Specifically, Mother failed to comply with drug screens and instead provided fake urine to hide her PCP use. *See id*. at 28-29. The court also noted Mother was inconsistent in her visitation with A.H. and is hostile with M.H. during their visitation. *See id*. at 27.

Our review reveals no error of law or abuse of discretion by the trial court in concluding grounds existed to involuntarily terminate Mother's parental rights pursuant to section 2511(a)(2). As discussed above, M.H. was placed in the custody of DHS in October 2019, when he was four years old, due, in part, to Mother being "under the influence." N.T., 11/14/24, at 11. At the time of A.H.'s birth approximately twenty months later, Mother tested positive for PCP, which she acknowledged she was addicted to for "probably more than" ten years. *Id*. at 75-76. Mother testified that, in 2023, she bought "fake urine" so that she could "pass the drug screens" and "because I was in my addiction." *Id*. at 75. Mother testified at the termination hearing that she no longer uses PCP, but she did not specify when she stopped using it. *See* N.T., 1/24/25, at 34. Mother admitted that she had not participated in random drug screens at the CEU in 2024. *See* N.T., 11/14/24, at 73.[8]

_____

[8] Mother testified that she attended weekly urine screens instead at the Wedge, and that the screens have been negative except for alcohol. *See* N.T., 1/24/25, at 33.

Moreover, Mother testified that she started attending treatment at the Wedge for both drug and alcohol, and mental health, in approximately March or April of 2024, but that she has not "complete[d] any of it. I'm still in [sic] active going to the Wedge. They don't just graduate you overnight." *Id*. at 8, 32; *see also* N.T., 11/14/24, at 78. According to Ms. Belzince, Mother had last attended the Wedge in 2020, and she did not receive any treatment during the intervening years until April of 2024. *See* N.T., 11/14/24, at 18. Based on the foregoing testimonial evidence, Mother has failed to satisfy her objectives regarding her drug and alcohol addiction and mental health concerns, given her long periods of non-compliance.[9]

With respect to supervised visitation, Mother acknowledged, "I have not seen [A.H.]" for an unspecified amount of time, but she baldly asserted, "they don't let me see my daughter." N.T., 1/24/25, at 27; *see also* 11/14/24, at 53 (Ms. Belzince's testimony that Mother attended less than fifty percent of the weekly visits offered with A.H.). Mother testified that she indeed wants to visit A.H. as well as M.H. *See* N.T., 1/24/25, at 27-28.[10] Ms. Belzince explained that M.H. has told her:

_____

[9] *See In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (providing that a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous").

[10] Further, Mother declared that, although her visitation with M.H. is at his discretion, "I believe in my heart that my son really wants to see me. He . . .
*(Footnote Continued Next Page)*

- 12 -

[H]e does not want to see [M]other. [He] becomes emotionally distressed after seeing Mother.

* * * *

[M.H.] states that during the visits [M]other is very angry, which I have also observed. Mother does scream at [M.H.]. Mother [has] also playfully state[d] that she would hit him.

One time during the visit I observed that [M]other had punched the wall.

N.T., 11/14/24, at 24-25.[11]  In sum, our review of the record amply supports the court's conclusion that Mother did not make sufficient progress concerning her supervised visitation objective.

Lastly, Ms. Belzince testified that she assessed Mother's home in June 2024, approximately five months before the involuntary termination hearing commenced, and it was appropriate for only one child. ***See id***. at 19, 62. Ms. Belzince testified that she requested to assess Mother's home again in October 2024, but Mother did not allow it. ***See id***. at 19-20, 50.

_____

has a lifestyle now that he's used to with [his foster mother] at this point. . . ." N.T., 1/24/25, at 28. However, Ms. Belzince testified that M.H. last saw Mother on two occasions, on June 10 and September 16, 2024, and Ms. Belzince opined that he participated for the purpose of seeing A.H. ***See*** N.T., 11/14/24, at 22, 24.

[11] After this testimony, while Ms. Belzince was still on the witness stand, Mother interjected, "She's lying." N.T., 11/14/24, at 25. The trial court noted, in fact, that Mother "was extremely disruptive throughout the proceedings." Trial Ct. Op., 4/22/25, at 29. Our review confirms that Mother continually interrupted Ms. Belzince from the witness stand during the subject proceedings.

Following our review, we conclude that the evidence supports the trial court's finding of grounds for termination of Mother's parental rights pursuant to section 2511(a)(2). Mother's repeated and continued incapacity due to her drug and alcohol addiction and/or mental illness have caused the Children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. By the conclusion of the hearings, M.H. had been in placement for more than five years, and A.H. for her entire life of more than three years. Thus, given Mother's long periods of non-compliance with her objectives, the record also supports termination under the final element of section 2511(a)(2), that the causes of Mother's incapacity cannot or will not be remedied. **See A.H.**, 247 A.3d at 443 ("Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."). We therefore conclude that Mother's arguments concerning section 2511(a)(2) merit no relief.

Mother next argues the trial court erred in concluding that termination of her parental rights was in the Children's best interests. Section 2511(b) mandates that the "primary consideration" for a court in considering an involuntary termination petition is the child's "developmental, physical and emotional needs and welfare." **In the Interest of K.T.**, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted); **see also** 23 Pa.C.S.A. § 2511(b). The child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific

developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **K.T.**, 296 A.3d at 1109. Our High Court has emphasized:

> [courts] must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. **See** [**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011)] (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). **See also Int. of M.E.**, 283 A.3d 820, 836–37 ([Pa. Super.] 2022) (To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship[.]")

**Id**.

Furthermore, in **In re T.S.M.**, our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id**. at 269. Because "[c]hildren are young for a scant number of years, . . . we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id**.

Turning to section 2511(b), Mother argues that the evidence was insufficient for the court to terminate her parental rights under this section because she "can provide a home for the [C]hildren. Mother also wants to

visit the [C]hildren and it would be in the [C]hildren's best interest to not terminate" her parental rights. Mother's Br. at 22.

The trial court concluded that the Children had been placed with supportive caregivers, and the Children have a parental bond with their respective foster parents, who provide for their daily emotional and physical needs. *See* Trial Ct. Op., 4/22/25, at 24. Conversely, the court found Mother lacked the "capacity and understanding to address the[] Children's basic emotional and physical needs." *Id*.

Following our review, we conclude that the trial court did not err in finding that termination of Mother's parental rights was in the Children's best interests, given that there is no evidence of record that a parental bond exists between the Children and Mother.

Ms. Belzince testified that Mother engages with M.H. with hostility rather than affection, and that she "is more worried about why he is rejecting her visits [than] trying to make amends and see if there is any other way that she can make him happy and make him want to see her." N.T., 11/14/24, at 31. Ms. Belzince observed:

> When Mother engages with [M.H.] it's a lot of interrogation [by Mother to M.H.]. And I personally have been there . . . numerous times where [M.H.] became physically and verbally upset and would cry. And it would take a lot to emotionally calm him down.

N.T., 11/14/24, at 31; *see also id*. at 24 (Ms. Belzince's testimony that at M.H.'s last visit with Mother and A.H., Mother "began interrogating" M.H. "as

- 16 -

to why he does not want to have visits with her."). Further, Ms. Belzince testified that M.H.

> stated to me numerous times . . . [that he] does not like having her as a mother. He stated that he wished that she wasn't his mother. And that he feels [that] if he was to go back to his mother he would just end back up in care. And [M.H.] stated that he feels as if his mother does not like him. And that she wants him in a bad home as opposed to a good home because every time he gets into a good home she always jeopardizes the home.

*Id*. at 32. Ms. Belzince testified that M.H. has resided in his current pre-adoptive foster placement since April of 2022, and that it is a "loving and therapeutic" home. *Id*. at 32-33. Further, since the court granted him the discretion to attend supervised visits with Mother, Ms. Belzince testified that M.H. "has not had any behavioral issues in school. He has not been suspended. And has not been getting detention." *Id*. at 37. In fact, she testified that "he is an honor roll student, perfect attendance." *Id*.

With respect to A.H., who was three years old during the subject proceedings, Ms. Belzince testified that A.H. does not recognize Mother "as mom." *Id*. at 34. A.H. has resided in her pre-adoptive foster placement, separate from M.H., since she was three days old. *See id*. Ms. Belzince testified that A.H. calls her foster mother "mom," and A.H. "is well bonded with her." *Id*. at 35. Additionally, the Children's caregivers coordinate sibling visits and will continue to do so following the termination of Mother's parental rights. *See id*. at 39.

Thus, on this record, there is no evidence that terminating Mother's parental rights would destroy an existing, necessary, and beneficial relationship between the Children and her. **See K.T.**, 296 A.3d at 1109. Rather, the Children share a relationship of this nature with their respective foster parents. Further, given that the record demonstrates that Mother has neither remedied her drug and alcohol and mental health problems nor sufficiently complied with supervised visitation, we conclude that the court did not abuse its discretion in determining that the Children's developmental, physical, and emotional needs and welfare will be served by terminating Mother's parental rights pursuant to section 2511(b). Thus, we affirm the decrees involuntarily terminating Mother's parental rights to the Children.

With respect to Mother's appeal from the orders changing the Children's permanency placement goals from reunification to adoption, we conclude that it is moot given our disposition to affirm the involuntary termination decrees. **See A.H.**, 247 A.3d at 446.

Decrees affirmed. Appeal from goal change orders dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/29/2025